1
2
3
4
5
6

The Honorable Lauren King

7
8
9

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10
11
12
13
14
15
16

UNITED STATES OF AMERICA,

　　　　　Plaintiff

　　v.

DONTE JAMAL MCCLELLON,

　　　　　Defendant.

NO. CR22-073 LK

UNITED STATES' TRIAL BRIEF

17
18

## I.　　INTRODUCTION

19
20
21
22
23
24
25
26
27

　　　Defendant Donte McClellon obtained three Paycheck Protection Program (PPP) loans worth more than $500,000 under false pretenses. McClellon is the sole listed owner and manager of three Washington-based entities: Frostlake LLC, Cannonlake LLC, and Skylake LLC. He sought a PPP loan on behalf of each LLC in the early days of the COVID-19 pandemic. He claimed in loan applications that each entity had monthly payroll expenses and employees for whom it paid payroll taxes. McClellon submitted supporting documents with the applications, including IRS Form 941s, IRS Schedule Cs, and bank documents. In total, McClellon claimed that his entities employed 27 people, paid about

United States' Trial Brief - 1
*United States v. McClellon*, CR22-073LK

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

$2.3 million in payroll in 2019, and paid the IRS more than $500,000 in employment taxes that year.

None of this was true. Exhibits and testimony will show that each of McClellon's entities was a sham with no payroll, no employees, and no business operations. For example, none of the entities paid any federal or state payroll or excise taxes in 2019 or 2020. Their Secretary of State registrations were lapsed by the time McClellon filed his PPP applications, and the entities had no Internet presence to speak of. Each entity's claimed business address was McClellon's home in Seattle. McClellon's supporting documents were fake too: He submitted with his PPP applications Schedule Cs and Form 941s he never filed with the IRS. He doctored or invented bank letters and statements to make it appear he had business accounts in January 2020 when he did not. He continued his fraud through at least February 2021, when he submitted second-round draw PPP applications for his entities. McClellon's fraud was meticulous, deliberate, long-term, and designed to take advantage of PPP lenders at a time of national crisis.

McClellon's trial is scheduled to start on January 8, 2024, at 9:00 a.m. The United States will be represented by Assistant United States Attorneys Lauren Watts Staniar and Jessica Manca. Federal Bureau of Investigation (FBI) Special Agent Armando Ramirez III will sit at counsel table. McClellon is represented by Stephan Illa and Peter Camiel.

McClellon is detained pending trial. There are three pending motions: defense's motion to access jury selection records (Dkt. No. 167), which this court referred to Chief Judge Estudillo (Dkt. No. 185); defense's motion in limine to exclude Rule 404(b) evidence (Dkt. No. 181); and the government's motion in limine to exclude evidence of lender negligence and profits (Dkt. No. 182).

The United States expects to call approximately 15 witnesses during its case-in-chief. The United States anticipates that it will be able to present its case-in-chief in three days, assuming reasonable cross-examination by the defense.

United States' Trial Brief - 2
*United States v. McClellon*, CR22-073LK

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

## II.    FACTUAL SUMMARY

### A.  Background of the CARES Act and the PPP

Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act in March of 2020 in response to the COVID-19 pandemic. The CARES Act created the Paycheck Protection Program ("PPP") loan program. *See* 15 U.S.C. § 636(a)(36). PPP provided SBA-backed loans that helped businesses keep their workforce employed during the COVID-19 crisis. "The intent of the [CARES] Act is that SBA provide relief to America's small businesses expeditiously, which is expressed in the Act by giving all lenders delegated authority and streamlining the requirements of the [SBA's] regular 7(a) loan program." Lender Rule, 85 Fed. Reg. 33,010-01, 33,011 (June 1, 2020).

Only a small business in operation on February 15, 2020 and that paid federal payroll taxes was eligible to obtain a PPP loan. 15 U.S.C. § 636(a)(36)(F)(ii). Borrowers certified compliance with these basic criteria and provided average monthly payroll figures from which lenders calculated the loan amount. Borrowers also provided payroll documentation like IRS Form 941s and 940s (forms businesses file with federal payroll), as well as proof that the business existed as of February 15, 2020, which often included bank statements. Borrowers also certified they would use the funds for approved purposes, which included paying salaries and other business expenses. 15 U.S.C. § 636(a)(36)(G)(i).

SBA permitted lenders to "rely on borrower representations," and, to the extent the application contained errors or needed further support, directed "the lender [to] work with the borrower to remedy the issue." Lender Rule, 85 Fed. Reg. at 33,013. SBA guaranteed the full amount of the loan, and most PPP loans were forgiven. *See* First Rule, 85 Fed. Reg. 20816 and SBA, Interim Final Rule, 85 Fed. Reg. 33004 (June 1, 2020).

### B.  Background of this case

In May and June 2020, at the height of the COVID-19 pandemic, McClellon applied for and obtained three PPP loans from three different financial institutions on behalf of three entities he claimed to own and control—Frostlake LLC, Skylake LLC, and

United States' Trial Brief - 3
*United States v. McClellon*, CR22-073LK

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Cannonlake LLC. Dkt. No. 174, ¶ 15. The following chart shows McClellon's loans, the lenders, and the corresponding counts:

| McClellon Entity | Lender | Application Date | Amount Funded | Counts |
| --- | --- | --- | --- | --- |
| Frostlake LLC | Kabbage, Inc. | 5/12/2020 | $20,833 | 1 – 3 |
| Skylake LLC | First Home Bank | 6/11/2020 | $282,800 | 4 |
| Cannonlake LLC | Celtic Bank | 6/23/2020 | $197,315 | 5 |

### 1.    Counts 1–3 (Wire Fraud)

McClellon obtained a $20,833 loan for Frostlake LLC from Kabbage, a financial technology company. This loan underpins Counts 1, 2, and 3, which all charge wire fraud.

McClellon made at least two material misrepresentations in his PPP loan application to Kabbage. He certified that Frostlake "was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes . . . ." In support of the application, McClellon provided Kabbage a 2019 Schedule C for Frostlake and a one-page bank statement from Bank of America, among other documents. Dkt. 174 ¶ 19.

These affirmations and supporting documents were false and misleading. Frostlake was not in operation as of February 15, 2020. A witness from the Washington Department of Revenue ("DOR") will explain that Frostlake was never registered to do business in Washington, and it never paid excise taxes, which businesses of Frostlake's claimed size are required to do. Frostlake's business address is McClellon's personal residence, and the business had no Internet presence. Witnesses from the IRS and Washington Employment Security Department ("ESD") will explain that Frostlake never paid any payroll taxes (federal or state). It was never registered as an employer with ESD, nor did it disclose any employees to any state or federal entity. Frostlake's Secretary of State ("SOS") registration had lapsed by the time he applied for the PPP loan; McClellon reinstated the company months later, in February 2021. The 2019 Schedule C is a blatant forgery. McClellon never

United States' Trial Brief - 4
*United States v. McClellon*, CR22-073LK

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

filed a 2019 Schedule C for Frostlake. The government intends to admit McClellon's entire 2019 tax returns as evidence. An IRS witness will explain that the Form 1040 McClellon filed with the IRS (to which the Frostlake Schedule C would have attached) is a two-page document in which McClellon claims no income. It has no attachments.

Kabbage relied on McClellon's certifications and supporting documents—as SBA directed it to—and issued McClellon a PPP loan for $20,833. On May 14, 2022, Kabbage deposited the loan proceeds into McClellon's personal account at Ally Bank. The next day, on May 15, McClellon transferred 98% of the loan proceeds ($20,520) to his investment account at Webull. He did not use the PPP funds for payroll or business expenses, as he promised he would.

McClellon used interstate wires to perpetuate his fraud: First, on May 7, 2020, he uploaded the fake Frostlake Schedule C to Kabbage's loan portal. Second, on May 8, 2020, McClellon sent an email to Kabbage's customer service address asking how to add a bank account to his Kabbage account, something he needed to do secure the loan. Finally, on May 12, 2020, McClellon transmitted his loan application documents to a Kabbage server hosted by Amazon Web Services in Northern Virginia. Each of these documents or communications traveled from McClellon's location in Washington state to a server located outside of Washington state.

### 2. Count 4, Skylake to First Home Bank (Bank Fraud)

McClellon again lied and forged documents to obtain $282,800 in PPP funds from First Home Bank, which underpins Count 4 (bank fraud, 18 U.S.C. § 1343(2)).

McClellon made several false statements to obtain PPP funds from First Home Bank. McClellon certified in application materials that Skylake "was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes . . . ." He stated in the application that Skylake had 13 employees and an average monthly payroll of $104,815.42. McClellon affirmed that the funds obtained would be used to retain workers and maintain payroll, or for some other enumerated business purpose. In support of the

application, McClellon submitted IRS Form 941s and a 2019 Schedule C purportedly for Skylake, as well as a letter from Radius Bank stating that Skylake's account there was opened on January 5, 2020.

Again, none of this was true. Skylake never paid any payroll taxes (federal or state). It was never registered as an employer with the Washington ESD, nor did it disclose any employees to any state or federal entity. Although Skylake was briefly registered with the Washington Secretary of State, that registration was administratively dissolved in September 2019. Evidence will show that McClellon filed excise tax statements with the Washington DOR claiming that Skylake had "no business activity" between 2016 and 2019. The federal tax documents McClellon filed with his application are fake. The IRS never received any 2019 tax forms from Skylake—either Form 941s or a Schedule C. Again, McClellon's 2019 1040 (to which the Schedule C would have attached) is a two-page document in which McClellon claims no income. The Radius Bank letter is fake too: McClellon altered it to make it look like Skylake opened a business account at Radius in January 2020. The truth is that McClellon opened Skylake's Radius Bank account on June 5, 2020, about a week before he applied for this PPP loan.

First Home relied on McClellon's certifications, as SBA directed it to do, and funded the Skylake loan. On August 25, First Home deposited $282,800 into a Radius Bank account in Skylake's name, with McClellon as the sole signatory. McClellon did not use the money to pay employees or for other permitted business expenses. Instead, between August 25 and October 7, he transferred $200,000 from the Radius bank account into his personal checking account at Ally bank, where he used it to fund more investments or for personal expenses such as an expensive gym membership and laser hair removal.

### 3.    Count 5, Cannonlake LLC to Celtic Bank (Bank Fraud)

McClellon provided fake statements and documents to secure an additional $197,315 in PPP loans on behalf of Cannonlake LLC. This loan underpins Count 5.

United States' Trial Brief - 6
*United States v. McClellon*, CR22-073LK

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

McClellon submitted a PPP loan to Celtic Bank on June 23, 2020 in which he certified that Cannonlake was in operation as of February 15, 2020 and had employees for whom it paid taxes. He claimed Cannonlake had 13 employees and an average monthly payroll of $78,926. McClellon certified that he would use any PPP funds for a permitted purpose (either payroll or an enumerated list of business purposes). In support of the Cannonlake application, McClellon submitted a 2020 Q1 Form 941 claiming Cannonlake made more than $80,000 in payroll tax deposits that quarter. He also submitted a letter from BBVA bank certifying that Cannonlake had an Azlo business account there that was opened on January 17, 2020.

The government's evidence will show these statements and supporting documents were false. Cannonlake had no employees for whom it paid payroll taxes. Washington ESD and Washington DOR have no records of Cannonlake as an employer or a business. Although Cannonlake was at one time registered with the Washington Secretary of State, the registration was dissolved in 2018 because Cannonlake never filed an annual report. IRS testimony and exhibits will show that Cannonlake never filed Form 941s with the IRS or paid any taxes. The Form 941 McClellon submitted in support of the Cannonlake loan is a forgery. Testimony from PNC (which acquired BBVA) will show that the Cannonlake Azlo bank letter is fake too: Cannonlake had an Azlo Business Checking account with BBVA, but that account was opened on June 17, 2020, not January 17 as McClellon's fake letter claimed. BBVA never issued a bank verification letter to McClellon for the BBVA/Cannonlake account.

Celtic Bank relied on McClellon's certifications—as SBA directed it to do—and approved the Cannonlake loan. On June 24, 2020, Celtic deposited $197,315 into Cannonlake's BBVA bank business account. McClellon was the sole signatory on this account. Between June 24 and October 10, 2020, McClellon transferred about $171,000 of those loan proceeds to his personal Ally bank account. McClellon did not spend the money on payroll or business expenses, as promised.

United States' Trial Brief - 7
*United States v. McClellon*, CR22-073LK

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### 4.      Unfunded loans

The government will show that McClellon's applied for at least eight additional PPP loans on behalf of Frostlake, Cannonlake, and Skylake between May 7, 2020 and February 26, 2021 as part of his scheme to defraud. *See* Dkt. 174 ¶ 16. These unfunded applications follow the same pattern as McClellon's funded loans: He submitted fake tax documents and forged or materially altered bank statements in an attempt to show that the relevant McClellon entity was in operation as of February 15, 2020 and had employees for whom it paid payroll taxes. On some occasions, McClellon submitted the same fraudulent documents he submitted for the funded loans.

### 5.      Other false representations

McClellon exploited pandemic assistance programs in other ways too. He obtained COVID-related unemployment insurance from Washington ESD starting in early 2020, claiming in weekly filings that he was unemployed and had been taking real estate classes since November 2019. He did not identify any sources of income, such as PPP loan funding, and he ultimately received more than $20,000 in state unemployment benefits. On the spending side, McClellon falsified tax documents and other materials to qualify for a lease on an expensive New York City apartment, which he paid for with PPP loan proceeds.

### 6.      McClellon spent the loan proceeds on himself

McClellon promised each lender that he would spend the PPP funds in a particular way—on payroll or other enumerated business expenses. He did not. The government will present the testimony of FBI Special Agent (and former forensic accountant) Samantha Wendt, who will identify how McClellon spent the PPP loan proceeds and explain that those expenditures were not payroll or business expenses.

Agent Wendt's testimony and summary exhibits will show that McClellon received the loan proceeds into three accounts in his name or that he controlled:

| Account | Description | Associated Person | Loan | Date |
|---------|-------------|-------------------|------|------|
| Ally Bank X5842 | McClellon personal bank account | Donte McClellon | Frostlake / $20,833 | 5/14/2020 |
| BBVA X7291 | Cannonlake Azlo Business Checking | Donte McClellon | Cannonlake / $197,315 | 6/24/2020 |
| Radius X6316 | Skylake Business Checking | Donte McClellon | Skylake / $282,800 | 8/4/2020 |

McClellon had about $6.00 in his Ally account before he received the Frostlake loan. The day after Kabbage deposited the loan proceeds, he transferred 98% of the proceeds to a Webull investment account in his name.

McClellon funneled most of the proceeds from the Cannonlake and Skylake loan to the Ally Bank X5842 account too. After receiving the Cannonlake loan proceeds, he wired $171,0036.92 to Ally X5842 over about three and a half months. He spent the remaining proceeds on travel and daily living expenses. After receiving the Skylake loan proceeds into Radius X6316, McClellon wired $200,000 to Ally X5842 over about six weeks. He also paid for personal expenses directly from his BBVA and Radius checking accounts. McClellon used the Ally X5842 account to fund his Webull investment accounts, Coinbase account, and personal expenses. That includes an additional $65,175.40 on his New York apartment rent, $18,485.06 on travel, approximately $20,000.00 on Uber, approximately $73,523.00 on retail, and $17,857.93 on Equinox gym. SA Wendt did not identify any payroll expenditures from McClellon's accounts.

### III.    CHARGES AND ELEMENTS

A grand jury indicted McClellon for three counts of bank fraud in May 2022. In December 2022, the grand jury returned a superseding indictment charging three counts of wire fraud and two counts of bank fraud. Dkt. No. ¶ 62. The grand jury returned a second superseding indictment on November 29, 2023 that charges three counts of wire fraud

United States' Trial Brief - 9
*United States v. McClellon*, CR22-073LK

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

(Counts 1 through 3) and two counts of bank fraud under 18 U.S.C. § 1344(2) (Counts 4 and 5). The second superseding indictment is the operative indictment.

**Counts 1 through 3**. Counts one through three of the second superseding indictment charge wire fraud. To obtain a conviction for wire fraud, the government must prove:

*First*, beginning in or about May 2020 and continuing through at least February 2021, McClellon knowingly participated in, devised, or intended to devise a scheme or plan to defraud for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, or promises;

*Second*, the statements made as part of the scheme were material, that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

*Third*, McClellon acted with the intent to defraud, that is, the intent to deceive and cheat; and

*Fourth*, on or about May 7, 2020, May 8, 2020, and May 12, 2020 McClellon used, or caused to be used, interstate wire communications to carry out or attempt to carry out essential parts of the scheme. Each wire listed above constitutes a separate count of the second superseding indictment.

**Counts 4 and 5**. Counts four and five of the second superseding indictment charge bank fraud under 18 U.S.C. § 1344(2). To obtain a conviction for bank fraud, the government must prove:

*First*, the defendant knowingly carried out a scheme or plan to obtain money or property from a specified financial institution by making false statements or promises;

*Second*, the defendant knew that the statements or promises were false;

*Third*, the statements or promises were material; that is, they had a natural tendency to influence, or were capable of influencing, a financial institution to part with money or property;

United States' Trial Brief - 10
*United States v. McClellon*, CR22-073LK

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*Fourth*, the defendant acted with the intent to defraud; and

*Fifth*, the financial institution was federally insured.

## IV.    ANTICIPATED LEGAL AND EVIDENTIARY ISSUES

The United States anticipates that the following legal or evidentiary issues may arise at trial. Should any unanticipated issues arise, the United States respectfully requests the opportunity to present additional briefing.

### A.    Self-authenticating Business and Public Records

The government will offer self-authenticating business records and certified public records under Federal Rule of Evidence 803(6), 803(8), and 902(11). Consistent with these evidentiary rules, the government provided timely notice of its intent to offer these records, and the defense does not object to their authenticity.

#### 1.    The government provided timely notice of these records, and the defense does not challenge authenticity.

The government first provided notice to defense of its intention to offer records pursuant to 902(11) certifications in March 2023—more than nine months before the current trial date. *See* Ex. A. The disclosure included a four-page chart that identified the business and public records exhibits by Bates-stamp and attached the relevant 902(11) certificates, which the government had already provided in discovery. The government supplemented these disclosures by email and letter on October 17 and October 20, 2023, identifying a handful of additional records and certificates. *See* Ex. B. The government resubmitted these disclosures to current defense counsel on October 27, the day they were appointed.

Government's counsel and defense counsel discussed the government's 902(11) disclosures in a November 21 meet and confer. The government confirmed its intention to admit self-authenticating business and public records, and defense counsel informed counsel for the government that they would not object to the authenticity of the proposed exhibits.

United States' Trial Brief - 11
*United States v. McClellon*, CR22-073LK

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## 2.    The business records are admissible.

The government intends to admit several business records pursuant to Federal Rule of Evidence 902(11) certifications rather than live testimony, a process the Rules of Evidence expressly envision. Those rules provide that the 803(6) conditions must be shown "by the testimony of the custodian or another qualified witness, *or* by a certification that complies with Rule 902(11) or (12) . . . ." Fed. R. Evid. 803(6)(D) (emphasis added). Rule 902(11) "was intended to obviate the need for live witnesses to parade to the stand to support the admission into evidence of business records." *United Asset Coverage, Inc. v. Avaya Inc.*, 409 F. Supp. 2d 1008, 1052 (N.D. Ill. 2006) (Shadur, J., Fmr. Chairman of the Judicial Conference's Advisory Committee on the Rules of Evidence); *see also* Fed. R. Evid 806(3), Advisory Committee Notes to the 2000 Amendment ("[T]he foundation requirements of Rule 803(6) can be satisfied under certain circumstances without the expense and inconvenience of producing time-consuming foundation witnesses."). So, a business record is admissible under a 902(11) certificate—without authenticating testimony—unless the opponent to admission "show[s] that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." *Id.* This is a high burden. *See United States v. Khatallah*, 278 F. Supp. 3d 1, 8 (D.D.C. 2017) (admitting cell phone records from foreign company over objection where "the record is silent as to any indication of the alteration of the records").

Attached as Exhibit C is list of exhibits the government anticipates admitting pursuant to 902(11) certifications. The records include loan applications, bank account statements, transactional records, billing records, and customer account information. These are prototypical business records created, maintained, and relied upon in the ordinary course of business by financial institutions, internet service providers, technology companies, and various other businesses. *See* Ex. C; *see also* Fed. R. Evid. 803(6), 902(11). The record does not need to be created by the business itself. Rather, a record generated by a third party—such as a loan application—becomes a business record of the company that

United States' Trial Brief - 12
*United States v. McClellon*, CR22-073LK

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

relies upon it in the ordinary course. *See United States v. Childs*, 5 F.3d 1328, 1332 (9th Cir. 1993); *see also United States v. Siders*, 712 F. App'x 601, 603 (9th Cir. 2017) (affirming admission of loan application documents because "declaration established that the applications were received in the course of loan processing and maintained thereafter, and this occurred in the regular course of business," so the records were admissible without authenticating testimony).

### 3.    The certified public records are admissible.

Rule 803(8) provides an exception to the hearsay rule for public records from a public agency or office relating to an activity of that office. Fed. R. Evid. 803(8); *United States v. Weiland*, 420 F.3d 1062, 1073 (9th Cir. 2005). As with the business records described above, copies of public records are admissible without live testimony if "the copy is certified as correct by . . . the custodian or another person authorized to make the certification." Fed. R. Evid. 902(4).

Here, the government will offer certified copies of McClellon's driver's license, Washington Secretary of State records, and Federal Deposit Insurance Corporation certificates. *See* Ex. C. Again, there is no credible suggestion that these routine government documents are untrustworthy. *See* Fed. R. Evid. 803(8)(B). The government provided these documents to defense in discovery and indicated its intention to use them at trial, although notice is not required under Rule 902(4). These documents are therefore admissible without authenticating testimony.

### B.    Unfunded PPP Loans and Other Uncharged Fraud

The government intends to offer evidence of fraudulent conduct beyond the three PPP loan applications that were funded by Kabbage, First Home Bank, and Celtic Bank. This fraudulent conduct includes: (1) submitting at least eight other PPP loan applications on behalf of the McClellon Entities that were not approved; (2) submitting a pandemic unemployment claim to ESD; and (3) making false representations about his business

income to an apartment leasing company in New York City (where he spent a substantial portion of his fraudulently obtained PPP funds).

1.     **McClellon's scheme to defraud includes uncharged misrepresentations that are inextricably intertwined with charged misrepresentations.**

"Evidence should not be considered 'other crimes' or 'other act' evidence . . . if 'the evidence concerning the "other" act and the evidence concerning the crime charged are inextricably intertwined.'" *See United States v. Dorsey*, 677 F.3d 944, 951 (9th Cir. 2012)) (quoting *United States v. Soliman*, 813 F.2d 277, 279 (9th Cir. 1987). That is particularly true in scheme offenses such as wire and bank fraud, where uncharged conduct can be part of the scheme to defraud. *See, e.g.*, *United States v. Cancelliere*, 69 F.3d 1116, 1124 (11th Cir. 1995) (affirming admission of testimony regarding uncharged loans because those loans were part of the entire scheme to defraud); *United States v. Walker*, Case No. 18-00010, 2022 WL 686466, at *2 (D. Guam Mar. 8, 2022) (admitting social media photograph relating to the manner and means to defraud the FAA); *United States v. Schena*, Case no. 5:20-cr-00425-EJD-1, 2022 WL 2910185, at *24–25 (N.D. Cal. July 23, 2022) (admitting uncharged act in health care fraud case that fell within manner and means of the scheme to defraud).

Here, McClellon's scheme to defraud involved seeking PPP loans on behalf of the McClellon Entities (Frostlake, Skylake, and Cannonlake), even though the entities were not operating, did not have employees, and did not pay taxes. To make these entities look operational, McClellon lied on application forms and filed fake, forged, and altered financial documents with his applications. Some of his PPP applications were approved and some were not. Nevertheless, each of McClellon's PPP loan applications is part of the same overarching scheme. *See* Dkt. No. 174 ¶¶ 16–17, 30–31 (superseding indictment identifying uncharged loans as part of the scheme to defraud). And the fraud lasted from May 2020—when McClellon submitted his first PPP loan—through at least February 2021,

United States' Trial Brief - 14
*United States v. McClellon*, CR22-073LK

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

when banks rejected McClellon's second-round draw PPP applications. *Id.* ¶¶ 14, 26. The uncharged applications contain evidence that is relevant to proving McClellon's intent to defraud and the falsity of his representations in the charged counts. The government can present evidence of the unsuccessful PPP loan applications to give a full picture of McClellon's fraudulent scheme and its execution, particularly because the indictment identifies those applications as part of the manner and means. *Schena*, 2022 WL 2910185, at *24–25; *United States v. Loftis*, 843 F.3d 1173, 1178 (9th Cir. 2016).

Similarly, McClellon's unemployment insurance and apartment rental application both provide direct evidence of his intent to defraud and otherwise convey the complete and coherent story of his fraud. Both applications contain misrepresentations about McClellon and his businesses that are inconsistent with each other and inconsistent with what he told PPP lenders. For example, McClellon told PPP lenders that he operated three businesses as of February 15, 2020 with 27 employees and more than two million in annual payroll, and he told the apartment leasing company that he earned $324,000 per year working for Cannonlake. All the while, he repeatedly certified to ESD that he was a student with no other sources of income. McClellon submitted a forged 2019 tax return to the apartment leasing company, but that return is different from the forged 2019 tax returns he submitted to PPP lenders (and different still from a forged tax document he submitted to ESD). None was filed with the IRS. These discrepancies show that he made false statements that he knew were false, and that he intended to deceive and cheat with false representations about his businesses.

### 2. McClellon's uncharged misrepresentations are also admissible under Rule 404(b).

If the Court disagrees with the government's analysis and determines that McClellon's false representations about his entities are "other acts" subject to Rule 404(b), then the Court should "balance the probative value of the evidence against the possibility that the jury would be prejudiced against the defendant because of his participation in other

United States' Trial Brief - 15
*United States v. McClellon*, CR22-073LK

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

criminal conduct." *United States v. Sangrey*, 586 F.2d 1312, 1314 (9th Cir. 1978) (quoting *United States v. Young*, 573 F.2d 1137, 1140 (9th Cir. 1978).[1]

For the reasons articulated above, McClellon's misrepresentations to PPP lenders, Washington ESD, and his apartment company about his income and business operations are highly probative of his scheme to defraud, his intent to defraud, and the falsity of his representations. McClellon's inconsistent representations about his businesses are key to establishing that the businesses did not exist, and that McClellon intentionally lied about his business operations. The inconsistencies are only prejudicial in the sense that they tend to prove essential elements of the charged crimes: that McClellon had a scheme to defraud that involved making false representations about his businesses. These are permissible purposes under Rule 404(b), and the evidence should be admitted for those purposes.

## C.    **Summary Charts**

The government will use charts to summarize voluminous materials and aid the jury in its review of the evidence. Drafts of those charts are attached as Exhibit D. They fall into three categories: charts summarizing voluminous financial statements (including charts demonstrating the flow of funds attributable to McClellon's fraud); charts summarizing the funded and unfunded loan application materials; and a timeline showing the events constituting McClellon's scheme. Each proposed chart is admissible under Rule 1006 or 611(a). In the alternative, the chart may be displayed to the jury as a demonstrative.

### 1.    **Federal Rule of Evidence 1006 Summary Schedules**

Federal Rule of Evidence 1006 provides that "[t]he proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot conveniently be examined in court." "A proponent of a summary exhibit must establish a foundation that (1) the underlying materials on which the summary

---

[1] Although the government does not believe the uncharged conduct falls under Rule 404(b), it provided timely notice to the defense of its intention to use this evidence. *See* Ex. A. In an abundance of caution, the government also complied with Rule 404(b)(3) by articulating the permissible purposes for which the evidence would be offered if it were subject to Rule 404(b) analysis.

United States' Trial Brief - 16
*United States v. McClellon*, CR22-073LK

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

exhibit is based are admissible in evidence, and (2) those underlying materials were made available to the opposing party for inspection." *Amarelu v. Connell*, 102 F.3d 1494, 1516 (9th Cir. 1997). "The purpose of the rule is to allow the use of summaries when the documents are unmanageable or when the summaries would be useful to the judge and jury." *United States v. Rizk*, 660 F.3d 1125, 1130 (9th Cir. 2011). The proponent of a summary also must establish that the underlying documents were made available to the opposing party for inspection. *United States v. Aubrey*, 800 F.3d 1115, 1130–31 (9th Cir. 2015). "The availability requirement ensures that the opposing party has 'an opportunity to verify the reliability and accuracy of the summary prior to trial.'" *Rizk*, 660 F.3d at 1130. Summaries must fairly represent the underlying documents, and their admission into evidence is left to the trial court's discretion. *Aubrey*, 800 F.3d at 1130.

The Ninth Circuit has affirmed the admission as substantive evidence of a wide variety of summary charts pursuant to Rule 1006 where such charts are based on the sponsoring witnesses' review of voluminous evidence. *See, e.g.*, *Aubrey*, 800 F.3d at 1130 (affirming admission of summary charts of flow of funds into and out of defendant's bank accounts); *Rizk*, 660 F.3d at 1130–31 (affirming admission of charts summarizing real estate transactions that comprised conspiracy); *United States v. Catabran*, 836 F.2d 453, 456–58 (9th Cir. 1988) ("The district court properly admitted the general ledger computer printouts upon which the chart was based, and these documents were available to the defendant for inspection. Consequently, we hold that the district court properly admitted the chart as a summary.").

The government's proposed exhibits summarizing financial data are precisely the types of charts that courts routinely admit under Rule 1006. The charts summarize voluminous financial records, including more than 600 pages of bank statements, investment account statements, cryptocurrency account statements, and peer-to-peer account records (the page count includes Excel spreadsheets printed to PDF). *See* Ex. D, at 1–12. The government made these underlying materials available to defense in discovery

and indicated in pretrial disclosures the financial documents it intended to use as exhibits. *See* Ex. A (letter from L. Staniar to E. Scanlan, March 23, 2022). The government also included early drafts of the financial summary charts in discovery, going above and beyond its disclosure obligations. Finally, the financial statements underlying the summary charts are all admissible as business records under Federal Rule of Evidence 806(3) and 902(11). *See supra* § IV.A.1. These summary charts are admissible. *Aubrey*, 800 F.3d at 1130 ("Multiple bankers' boxes of bank statements constitute the type of materials anticipated by Rule 1006.").

The loan summary charts and timeline are likewise admissible under Rule 1006. These "summaries [are] useful to the judge and jury," *Rizk*, 660 F.3d at 1130, who may struggle to keep the different loans, McClellon Entities, government documents, and lending institutions straight, *see id.* (affirming admission of charts summarizing real estate transactions integral to the mortgage fraud). The loan application, government records, and financial documents underlying the chart "(1) are admissible in evidence and (2) were made available to the opposing party for inspection." *Amarel*, 102 F.3d at 1516. These charts are admissible and should go back to the jury.

## 2. Federal Rule of Evidence 611(a) Summary Charts

Federal Rule of Evidence 611, addressing the Mode and Order of the Interrogation of Witnesses, gives the Court great discretion in what a witness may use during testimony to "(1) make the presentation effective for the ascertainment of the truth, [and] (2) avoid needless consumption of time." Fed. R. Evid. 611(a). Charts summarizing admitted evidence may be admissible under Rule 611(a) and may go back to the jury with a proper limiting instruction. *See United States v. Gardner*, 611 F.2d 770, 776 (9th Cir. 1980) (summary chart admissible in tax evasion case under Rule 611(a)); *see also* 2 McCormick on Evidence § 214 (July 2022 update) (noting that "pedagogic aids are welcomed as effective trial management aids pursuant to Federal Rule 611(a), so long as they are limited

United States' Trial Brief - 18
*United States v. McClellon*, CR22-073LK

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

in scope to summarizing admitted exhibits" and explaining that trial court may exercise discretion to formally admit such summaries or limit their use to testimonial aids).

In the event some of the summaries described in the above section are not considered to summarize voluminous records under Rule 1006, the Court may still admit them under Rule 611. *See United States v. Anekwu*, 695 F.3d 967, 981–82 (9th Cir. 2012) (district court may exercise sound discretion to admit summary charts into evidence, even if chart wouldn't satisfy Rule 1006). "Summary evidence . . . , 'can help the jury organize and evaluate evidence which is factually complex and fragmentally revealed in the testimony of the multitude of witnesses.'" *United States v. Shirley*, 884 F.2d 1130, 1133–34 (9th Cir. 1989) (affirming admission of chart summarizing how connections between various phone numbers associated with defendants). Here, as in *Shirley*, the offered charts summarize facts drawn from various loan applications and financial documents that the jury may have a difficult time organizing. The charts are factual and non-argumentative and may be admitted to aid the jury in reviewing the presented evidence and testimony. *Id.*; *Rizk*, 600 F.3d at 1130 (touchstone of summary chart analysis is whether the chart would be useful and non-prejudicial).

### 3.    Demonstrative Charts and Visual Aids

Should the Court find that any of the government's offered summary charts are not admissible under Rule 1006 or 611(a), the government intends to use the chart as a demonstrative, testimonial aid that should not go back to the jury. The Ninth Circuit routinely approves of using certain types of summary charts solely as "testimonial aids" both in direct examination and at closing. *See, e.g.*, *United States v. Wood*, 943 F.2d 1048, 1053–54 (9th Cir. 1991) (summaries of admitted evidence that does not fall within Rule 1006 "should be used only as a testimonial aid and should not be admitted into evidence or otherwise used by the jury during deliberations."); 2 McCormick on Evidence § 214 (July 2022 update) ("all jurisdictions allow the use of demonstrative aids throughout trial"). The government will offer testimony that the relevant aid is a fair and accurate

United States' Trial Brief - 19
*United States v. McClellon*, CR22-073LK

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

representation of the summarized evidence, which is all that is required to display it to the jury for pedagogical purposes. *See* 2 McCormick on Evidence § 214 (July 2022 update).

### D.    McClellon's Statements (Fed. R. Evid. 801(d))

The government expects to offer certain written and oral statements from the defendant at trial. For example, the government will offer defendant's email communications with lenders, loan and rental applications prepared by defendant, and audio recordings of conversations with defendant. These statements are not hearsay. *See* Fed. R. Evid. 801(d)(2).

McClellon's loan application documents are self-authenticating business records under Rule 902(11), as noted above. Any statements made by McClellon within those loan applications are statutory non-hearsay under Rule 801(d)(1). The loan applications themselves provide sufficient proof that McClellon was the one that filled them out: He listed himself as the contact on each loan; the business address on each application is his home address, as identified in his certified driver's license; the business tax identification number is either McClellon's social security number or an EIN the IRS provided McClellon; and the phone number he listed is a Voice over Internet Protocol (VOIP) number serviced by Google and linked to McClellon's email addresses. If more were needed (it is not) all the loan proceeds went to accounts in McClellon's name or on which he was the sole signatory.

McClellon's written messages with PPP lenders are self-authenticating business records as well. The emails came from one of McClellon's email addresses (djmcclellon@skylakex.com or djmcclellon@live.com) or are associated with his loan application through a lender tracking system. He identifies himself on the messages as "Donte" or "Donte M." This is sufficient to show that the statements are his for purposes of 801(d)(1). *See* Fed. R. Evid. 104. To the extent McClellon's written messages include responses by the lenders, those statements are not offered for the truth, but rather to provide context to McClellon's statements.

United States' Trial Brief - 20
*United States v. McClellon*, CR22-073LK

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The government will also offer audio recordings with defendant, which PPP lenders made in their regular course of business. These will be authenticated with witness testimony or through Rule 902(11) certificates. McClellon's statements within those recordings are not hearsay because the statements were "made by the party" and are "offered against" him. Fed. R. Evid. 801(d)(2). McClellon identifies himself on each call and provides details that only he would know, including his birthday, phone number, and the last four digits of his social security number. This is sufficient to show that the statements are his for purposes of Rule 801(d)(2).

McClellon may not introduce his own statements through the testimony of another witness. Although the United States is permitted to introduce such statements through the testimony of the witness pursuant to Federal Rule of Evidence 801(d)(2), that rule is unavailable to a defendant since he is the proponent of the evidence and, where he seeks to introduce it, it is not offered against him. *See United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000); *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1988). Under Rule 801(d)(2), a statement by a party is not hearsay only when it is being offered against the party that made the statement, not when it is offered on the declarant's behalf.

### G.    Transcripts of Recorded Conversations

The government intends to offer tapes of recorded conversations between McClellon and two banks: Celtic Bank (a PPP lender) and Radius Bank (where McClellon held an account). The government has prepared transcripts of the conversations to show the jurors while they listen to the recordings. The government has proposed Ninth Circuit Model Instruction 2.6, which instructs the jury that the recordings are evidence, and the transcripts are only a guide. That process is appropriate: the Ninth Circuit has approved of the use of transcripts of properly admitted recordings to aid the jury in understanding the recordings. *United States v. Turner*, 528 F.2d 143, 167–68 (9th Cir. 1975). While the transcripts should not be sent back to the jury room, the transcripts may be provided to the jury if they request to have the recordings replayed during deliberations. Because the jury

United States' Trial Brief - 21
*United States v. McClellon*, CR22-073LK

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

is instructed that the recordings control, the court is not required to review the transcripts to determine their accuracy. *United States v. Tisor*, 96 F.3d 370, 377 (9th Cir. 1996).

## V.    FORFEITURE

The United States seeks forfeiture of all proceeds McClellon obtained from his wire fraud and bank fraud schemes. The government provided notice to McClellon of this intent in the Second Superseding Indictment. *See* Dkt. No. 174. The United States also filed a Forfeiture Bill of Particulars specifically identifying the following funds and a sum of money for forfeiture:

1.    $16,394.44 in U.S. funds seized on or about May 16, 2022, from a Webull Financial, LLC., account number ending -66-11, held in the name of Donte McClellon, (the "Subject Funds"); and

2.    A sum of money reflecting the unrecovered proceeds the Defendant obtained from his wire fraud and bank fraud schemes (the "Forfeiture Money Judgment").
*See* Dkt. No. 51.

### A.    **Legal Basis for Forfeiture**

1.    Proceeds of McClellon's wire fraud scheme (including Counts one through three) are forfeitable under Title 18, United States Code, Section 981(a)(1)(C), by way of Title 28, United States Code, Section 2461(c).

2.    Proceeds of McClellon's bank fraud scheme (including Counts four and five) are forfeitable pursuant to Title 18, United States Codes, Section 982(a)(2).

3.    All proceeds of wire fraud and bank fraud schemes are subject to forfeiture if they are derived from or traceable to the scheme.

### B.    **Factual Basis for Forfeiture**

The United States expects the evidence at trial to establish that McClellon personally obtained approximately $500,948 in proceeds from his wire fraud and bank fraud schemes and that the Subject Funds, seized pursuant to a valid Forfeiture Seizure Warrant, constitute or are traceable to those proceeds. *See supra* § II.6. In addition to

United States' Trial Brief - 22
*United States v. McClellon*, CR22-073LK

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

forfeiture of the Subject Funds, the United States seeks a forfeiture money judgment that reflects the $443,416.41 of unrecovered proceeds McClellon personally obtained from the wire fraud and bank fraud schemes.

### C.    Legal Standard for Forfeiture

Criminal forfeiture is a form of punishment that is imposed as part of a criminal sentence. *Libretti v. United States*, 516 U.S. 29, 39–40 (1995). For the government to criminally forfeit property, there must be a predicate criminal conviction, a statute authorizing forfeiture for the crime of conviction, and evidence to support the statutorily required nexus between the property and the crime of conviction. *See e.g.*, *United States v. Garcia-Guizar*, 160 F.3d 511, 518–20 (9th Cir. 1998) (reviewing these requirements). With respect to the required nexus, the government must establish the forfeitability of the relevant property by a preponderance of the evidence. *Id.* at 517–18; *see also United States v. Martin*, 662 F.3d 301, 307 (4th Cir. 2011); *United States v. Rutgard*, 116 F.3d 1270, 1293 (9th Cir. 1997).

In other words, depending on the relevant forfeiture statute, the government must present evidence that establishes the relevant property is, "more likely than not," forfeitable as proceeds of the crime, property that facilitated the crime, and/or property involved in the crime. This lower standard of proof "is constitutional because the criminal forfeiture provision does not itself describe a separate offense, but is merely an 'additional penalty' for an offense that must be proved beyond a reasonable doubt." *Garcia-Guizar*, 160 F.3d at 518 (citing *United States v. Hernandez-Escarsega*, 886 F.2d 1560, 1577 (9th Cir. 1989)).

Here, there is statutory authority to forfeit the identified property following McClellon's conviction for wire fraud under Title 18, United States Code, Section 981(a)(1)(C), by way of Title 28, United States Code, Section 2461(c), and following McClellon's conviction for Bank Fraud under Title 18, United States Codes, Section 982(a)(2). The evidence introduced at trial will establish, to a preponderance, the proceeds

United States' Trial Brief - 23
*United States v. McClellon*, CR22-073LK

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

McClellon obtained from his fraud schemes and the nexus between the identified property and McClellon's offenses.

Upon conviction of a scheme to defraud, or of a conspiracy to commit a scheme to defraud, proceeds are subject to forfeiture if they are derived from or traceable to the scheme. It is not necessary for the United States to trace the proceeds to a particular execution of the scheme, such as a particular wire or mailing in a charged count. *See United States v. Lo*, 839 F.3d 777, 793–94 (9th Cir. 2016) (citing *United States v. Capoccia*, 503 F.3d 103- 117-18 (2d Cir. 2007) ("[w]here the conviction itself is for executing a scheme, engaging in a conspiracy, or conducting a racketeering enterprise," the proceeds for purposes of forfeiture include the proceeds of "that scheme, conspiracy, or enterprise)); *United States v. Venturella*, 585 F.3d 1013, 1015, 1016–17 (7th Cir. 2009) (forfeiture in a fraud case "extends to the entire scheme"); *see also* 18 U.S.C. § 981(a)(1)(C) (providing forfeiture authority for specified unlawful activities, including mail fraud and wire fraud, and for conspiracy to commit same).

The United States has recovered only some of the proceeds McClellon obtained through these fraud schemes. As permitted by Federal Rule of Criminal Procedure 32.2 and approved in case law, the United States is seeking to forfeit McClellon's unrecovered proceeds in the form of a judgment for a sum of money (also known as a "forfeiture money judgment"). *See* Fed. R. Crim. P. 32.2(b)(1)(A); *United States v. Nejad*, 933 F.3d 1162 (9th Cir. 2019) (affirming a district court's authority to enter forfeiture money judgments and reciting circuit precedent). The government typically forfeits a money judgment when the defendant has spent or otherwise disposed of the criminal proceeds, so they are no longer available to forfeit directly. *See Nejad*, 933 F.3d at 1165 (recognizing the necessity of forfeiture money judgments in this circumstance and holding "a contrary rule … would allow an insolvent defendant to escape the mandatory forfeiture penalty Congress has imposed simply by spending or otherwise disposing of his criminal proceeds before sentencing").

United States' Trial Brief - 24
*United States v. McClellon*, CR22-073LK

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### D.    **Forfeiture Process**

Federal Rule of Criminal Procedure 32.2 sets out the procedures for determining forfeitability of property in a criminal case. Forfeitures are decided after a guilty verdict is returned on a count that supports forfeiture. *See* Fed. R. Crim. P. 32.2(b)(1)(A). At that juncture, the specific question for the fact finder is "whether the government [has established the] requisite nexus between the property and the offense." *Id.* The forfeiture of a sum of money is determined by the court, not the jury. A defendant has no right to have a jury determine the forfeiture of a money judgment. *See id.* ("If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay.").

The calculation of a forfeiture amount "does not demand mathematical exactitude." *United States v. Ford*, 296 F. Supp.3d 1251, 1260 (D. Or. 2017) (citing *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011)). "[T]he court 'need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information.'" *Treacy*, 639 F.3d at 48 (quoting *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009) (internal quotations omitted)). Courts are "permitted to use general points of reference as a starting point . . . and may make reasonable extrapolations from the evidence established by a preponderance of the evidence at the sentencing proceeding." *Treacy*, 639 F.3d at 48.

Because forfeiture is determined post-conviction, and is considered part of sentencing, the rules of evidence do not strictly apply to forfeiture proceedings. *See, e.g.*, *United States v. Hatfield*, 795 F. Supp. 2d 219, 229–30 (E.D.N.Y. 2011) (holding neither the Federal Rules of Evidence nor *Daubert* apply to forfeiture hearings); *United States v. Creighton*, 52 Fed. App'x 31, 35–36 (9th Cir. 2002) ("[H]earsay evidence is permissible at sentencing and does not, per se, lack sufficient indicia of reliability."). The factfinder may consider any evidence that is "relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B). This includes any evidence presented by the parties during trial on the substantive criminal

United States' Trial Brief - 25
*United States v. McClellon*, CR22-073LK

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

offenses. *See id.* ("The court's [or jury's forfeiture] determination may be based on evidence already in the record. . . ."); *see also United States v. Newman*, 659 F.3d 1235, 1244–45 (9th Cir. 2011) (same), abrogated on other grounds by *Honeycutt v. United States*, 137 S. Ct. 1626, 1632 (2017).

If McClellon is convicted of any of the identified offenses, the United States expects to present the forfeiture case in a supplemental proceeding pursuant to Rule 32.2(b)(1). The United States is willing to waive its right to retain the jury for that proceeding and have the Court decided all forfeiture issues. *See* Fed. R. Crim. P. 32.2(b)(5). If, however, McClellon is unwilling to waive, the United States is prepared to present the forfeiture case to the jury. According to the Rules, the court must determine whether the jury will be retained for forfeiture before the jury begins deliberating. Fed. R. Crim. P. 32(b)(5)(A). In the event the jury is involved in the forfeiture proceeding, the United States is submitting proposed forfeiture jury instructions and a special forfeiture verdict form. The Court, not the jury, determines the sum of money to be forfeited. For this reason, the proposed jury instructions and special verdict form do not address the forfeiture of a sum of money.

In the forfeiture proceeding, the United States expects to rely primarily on the testimony and evidence introduced during the guilt/innocence phase of trial. The United States expects to present argument with respect to the forfeiture, but it does not anticipate presenting substantial additional testimony or exhibits. The United States reserves its right, however, to offer additional evidence in support of forfeiture, and to take different positions with respect to forfeiture, as necessary to respond to developments at trial.

United States' Trial Brief - 26
*United States v. McClellon*, CR22-073LK

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# VI.    CONCLUSION

This trial brief has been prepared to acquaint the Court with the legal and factual issues that may arise at trial. The United States is not aware of other legal issues that are likely to arise during trial. If other issues do arise, the government requests the opportunity to address those issues by way of a supplemental brief or briefs.

DATED this 22nd day of December, 2023.

Respectfully submitted,

TESSA M. GORMAN
Acting United States Attorney

*s/ Lauren Watts Staniar*
*s/ Jessica Murphy Manca*
LAUREN WATTS STANIAR
JESSICA MURPHY MANCA
Assistant United States Attorneys
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
Telephone:    (206) 553-7970
E-mail:          Lauren.Staniar@usdoj.gov
Email:           Jessica.Manca@usdoj.gov

United States' Trial Brief - 27
*United States v. McClellon*, CR22-073LK

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970